IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

    Plaintiff,

vs.                                                                                      No. Crim. 10-619 MCA

MARGARITO ANDRADE, Sr.,

    Defendant.

**MAGISTRATE JUDGE'S FINDINGS AND
ORDER GRANTING MOTION FOR EVIDENTIARY HEARING**

THIS MATTER is before the Court on the oral request of the trial judge that the undersigned magistrate judge handle Defendant's Motion for Evidentiary Hearing on Defendant's Medical Care While in Custody [Doc. 327], filed August 12, 2010. The Motion for Evidentiary Hearing is granted, and an evidentiary hearing was held on August 18, 2010.

The Court makes Findings as set forth below, and concludes that Defendant Margarito Andrade, Sr. ("Mr. Andrade") failed to establish that the medical care he has received while incarcerated at the Regional Correctional Center ("RCC") is inadequate or has contributed in any way to his difficulties in concentrating on his defense or in communicating with counsel.

**Findings**

1. Mr. Andrade was arrested on March 30, 2010 on charges including conspiracy, distribution of cocaine, distribution of marijuana, and use of the telephone to facilitate a drug trafficking offense.

2. Mr. Andrade was arraigned on April 2, 2010 before Chief United States Magistrate Judge Richard L. Puglisi and was ordered detained [Order of Detention, Doc. 172]. Mr. Andrade has remained in custody at RCC since that date.

3. On July 20, 2010, Mr. Andrade filed a Motion to Reopen Detention Hearing [Doc. 307]. In this motion, Mr. Andrade asserted that he suffers from diabetes, high blood pressure and back

problems. He stated that although RCC is aware of his medical problems, it has failed to ensure that he receive blood pressure medication on a regular basis, failed to adequately monitor his diabetes, and informed him that RCC is out of medication, especially pain killers. He alleged further that he has lost more than 13 pounds and has lost agility and strength in his right hand. In the motion, defense counsel stated her concern that Mr. Andrade is possibly incurring nerve damage due to the facility's failure to monitor the diabetes, and that he is subject to other possible complications of diabetes including severe nerve damage, kidney damage, blindness and stroke. Andrade requested that he be released to the custody of his girlfriend, Anna Hernandez. Counsel stated that the Government was "not necessarily opposed to this Motion but requests a hearing to determine what, if any, new circumstances exist to justify release."

4. On July 26, 2010, the Court entered an Order [Doc. 308], denying the motion for release. The Court noted that Mr. Andrade was essentially arguing that his conditions of confinement adversely affect his medical condition; however, "conditions of confinement do not overcome the presumption of detention." The Court noted further that an inmate is entitled to have reasonable and necessary medical care and treatment while he is in custody, but that a disagreement about what is necessary and proper care does not warrant release. Because Mr. Andrade was viewed as a flight risk by Probation, and he did not demonstrate anything to the contrary in the Motion, his request for release was denied.

5. Mr. Andrade's counsel thereafter filed the instant Motion for Evidentiary Hearing on Defendant's Medical Care While in Custody [Doc. 327]. In it, counsel re-stated the reasons raised in the Motion to Reopen Detention Hearing and attached some new information, including some of Mr. Andrade's medical records from RCC.

6. Counsel stated in the Motion that she "cannot ethically proceed to discuss the decisions to be made on the case until the Defendant receives adequate medical care." She says that because of his medical conditions, Mr. Andrade "cannot concentrate on the decisions to be made" and she "questions the Defendant's ability to assist counsel with the preparation of his defense." The

2

Assistant United States Attorney assigned to the case was not opposed to an evidentiary hearing on the issue of adequacy of the medical care Mr. Andrade is receiving while in custody.

7. The evidentiary hearing was held on August 19, 2010 before the undersigned Magistrate Judge. Mr. Andrade was present, with his attorney, Jacquelyn Robins. The government was represented by Joel R. Meyers, Assistant United States Attorney.

8. At the evidentiary hearing, counsel for Mr. Andrade stated he is not asking for release; is not attempting, by this motion, to bring a claim that he was subjected to cruel and unusual punishment; and is not asking for a competency hearing. Rather, counsel expressed her concern that Mr. Andrade's apparent difficulty in concentrating on the criminal proceedings and in communicating with her has been caused by inadequate treatment of his medical conditions, including Type II diabetes, high blood pressure and arthritis pain, during his incarceration at RCC. The purpose of this Motion, counsel stated, is to alert the Court to Mr. Andrade's difficultites and to determine whether he is receiving adequate medical care.

9. The government called Dr. Steven Wolf as a witness at the hearing. He testified telephonically. Dr. Wolf is a board-certified neurologist and is the medical director for the United States Marshal's Service, Prisoner Operations, in Washington, D.C. The Court determined that Dr. Wolf is qualified to render an expert opinion.

10. As part of his responsibilities, Dr. Wolf oversees the U.S. Marshal's responsibility to provide medical services to those in the Marshal's custody, and reviews requests for specialized care.

11. Dr. Wolf reviewed Mr. Andrade's medical records including the intake medical evaluation, and Mr. Andrade's medical history and medications. He also reviewed the daily physician's report for Mr. Andrade showing blood glucose testing, interviewed the nurse assistant who provides medical care to Mr. Andrade, and had follow-up discussions with officials at RCC on Mr. Andrade's case. He also reviewed the record of Mr. Andrade's commissary purchases while at RCC.

12. Dr. Wolf was apprised that Mr. Andrade is a Type II diabetic, and that he has high blood pressure and lower back pain related to degenerative spine disease. Type II diabetes is an adult-onset illness that results from the body's difficulty in extracting sugars from blood. Diabetes is traditionally treated with diet, exercise, and medication.

13. Mr. Andrade was diagnosed with diabetes more than three years ago, several years prior to his arrest on drug charges. His physician instructed him to avoid junk foods, eat smaller portions at meals, exercise and avoid simple, as opposed to complex, carbohydrates. To treat his diabetes, his physicians prescribed Metformin (*i.e.*, glucophage)[1], a drug used to control diabetes.

14. Due to Mr. Andrade's increasing blood sugar levels, his physician increased his Metformin dosage from 500 mg to 1000 mg, twice per day. Mr. Andrade takes one 1000 mg pill in the morning and another in the evening. (Def. Ex. B, at 2). Mr. Andrade also monitors his fluctuating glucose level by daily tests. He uses a glucose monitor. The test requires him to do a finger-prick test which results in drawing a drop of blood, which is then placed on a test strip and inserted into the monitor for a reading. Mr. Andrade indicates that he tests his levels up to four times a day.

15. Upon booking, Mr. Andrade was given a medical evaluation (Def. Ex. B, at 1). The evaluation shows his medical conditions, which included Type II diabetes, hypertension, and arthritic changes in the spine which resulted in back pain. The intake also shows medications he was taking.

16. Glucose levels can fluctuate based on a number of factors, including the time of day the test is taken; its proximity to meals; presence or absence of medication; ingestion of sugars; and stress or anxiety. Because numbers can fluctuate for a variety of reasons, many physicians instruct Type II diabetics that daily finger-prick testing is not necessary and often adds to a patient's anxiety levels. The purpose of the pin-prick is primarily to alert the diabetic that personal choices and conduct are affecting glucose levels. For example, if a diabetic gets a high reading and the reading

---

[1] Physician's Desk Reference 833 (53d ed. 1999).

reflects the recent ingestion of sugars, the diabetic is prompted to avoid those food choices.

17. A more reliable test is the hemoglobin $A_{1C}$ ("Hb $A_{1C}$"), administered by a physician. This test was administered on Mr. Andrade by his medical personnel.

18. Dr. Wolf testified that Mr. Andrade's blood glucose level is tested two times a day at RCC. This amount of testing, in Dr. Wolf's estimation, is far more frequent than would occur in a non-custodial setting. In other words, not only is the testing adequate, it is, according to Dr. Wolf, "way over the top."

19. Mr. Andrade concedes that he is receiving the same medication in the same doses from9 the physicians at RCC that he was receiving prior to his incarceration.

20. Mr. Andrade testified that, prior to his incarceration, he would see physicians every three or four weeks. In comparison, medical records submitted (Def. Ex. B) show that Mr. Andrade is being seen at RCC by a physician, nurse, or physician's assistant virtually on a daily basis.

21. Mr. Andrade testified that there was a period of days in which the RCC ran out of glucose monitor testing strips. Indeed, Def. Ex. B confirms that RCC did not have testing strips on June 5, 6, 7 (morning only), 12, and 13, 2010. However, the same records show that in the period of time from March 31, 2010 until August 17, 2010, Mr. Andrade was tested at least 240 separate times.

22. Dr. Wolf testified that the absence of the test results on those few dates on which the RCC did not have testing strips was irrelevant to the question of whether he received adequate medical care, as Mr. Andrade was being tested far in excess of what would be expected outside of custody.

23. Mr. Andrade submitted as an exhibit a printout from the internet indicating that neuropathy or nerve damage is a potential consequence of diabetes. However, Mr. Andrade presents no medical evidence or testimony indicating that he suffers from neuropathy or that any nerve damage was proximately caused by any lack of professional care provided by RCC. At most, Mr. Andrade indicates that neuropathy is a potential consequence; however, there is no indication

whatsoever that he has been diagnosed with this condition or that any act or omission by his custodian will likely result in Mr. Andrade developing neuropathy.

24. Mr. Andrade testified that he has loss of strength in his right hand, but has presented no medical evidence whatsoever indicating the diagnosis of the condition, its cause, or whether the loss of strength is in any way related to the medical care performed or allegedly not performed at the RCC. Dr. Wolf noted that spinal x-rays were taken, which could help evaluate the cause of any loss strength in his arm.

25. Mr. Andrade argues that, on the occasion when he received a high blood glucose test, no follow-up medication was given. The medical records show that on August 16, 2010, Mr. Andrade tested at 135 at 6:00 in the morning, and that evening a test strip showed a glucose reading of 470. The following morning, he tested at 136. Mr. Andrade offers no medical evidence indicating that any special medical care was required due to the unusually high glucose reading. Indeed, daily medication is not adjusted based on test readings. The same dosage is given morning and evening, and the glucose readings are simply to alert the diabetic patient of the need to be circumspect and cautious in reference to diet, exercise, meal portions, and avoidance of simple sugars. If a patient tests high, he should avoid the conduct that resulted in high testing.

26. Dr. Wolf testified that the onus for diabetic treatment is on the patient as well as on the medical professional. The patient is expected to do his part to attend to medical needs. Doing his part includes exercise, diet, taking medication, and avoiding those things that can result in high glucose readings.

27. A review of Mr. Andrade's commissary purchases between May 30, 2010 and August 15, 2010 show that he has purchased numerous candy bars, iced cinnamon rolls, cookies and other "junk foods" that he should not be ingesting. (Govt. Ex. 1). Indeed, the commissary record is replete with frequent and multiple purchases of snacks that are simply not good for a diabetic to consume.

28. Mr. Andrade testified that while he purchased all of those snacks, he contends that he

purchased them for others, including his three sons who are also incarcerated at RCC. Each son, however, has access to canteen privileges and could purchase these treats on his own. There is no evidence of record confirming who ate what snacks.

29. Mr. Andrade contends that he purchases the sweets to be able to increase his glucose levels when his readings are low, as he gets dizzy or lightheaded with low readings. However, Dr. Wolf pointed out that Mr. Andrade's blood glucose readings, as reflected in his RCC medical records, are not low, and therefore there is no need to ingest sweets to increase glucose.

30. In this case, Mr. Andrade has presented evidence that he suffers from Type II diabetes, hypertension, and lower back pain. These are not life-threatening conditions but are conditions that are controllable through personal responsibility and medication. Dr. Wolf noted that RCC conducted a complete physical exam, took an x-ray, administered the Hb $A_{1C}$ test, ordered a lipid profile, and performed a variety of metabolic tests on Mr. Andrade.

31. To summarize, Mr. Andrade testified that he has been evaluated by RCC doctors, had x-rays taken, submitted requests and was authorized to go to sick call, receives medication, and is subjected to daily diabetic testing.

32. Specifically, with respect to Mr. Andrade's Type II diabetes condition, Dr. Wolf testified that although Mr. Andrade's blood glucose levels are less than ideal, the medical personnel at RCC are treating his Type II diabetes appropriately and are following the guidelines set forth by the National Commission for Correctional Healthcare and the American Diabetic Association's standards for Diabetic Management in Correctional Institutions. Dr. Wolf noted that the Hb $A_{1C}$ test showed only a modestly elevated reading. Dr. Wolf stated further that Mr. Andrade needs to take more responsibility for ensuring that his diet is appropriate.

33. With respect to Mr. Andrade's high blood pressure, Dr. Wolf testified that the medical records show that Mr. Andrade has been maintained on medication for his hypertension throughout his stay at RCC, and although the records indicate modest elevations, his blood pressure is generally under adequate control.

34. Finally, Dr. Wolf testified that Mr. Andrade is receiving appropriate treatment for his back pain. That treatment includes pain medication and spinal x-rays; in addition, a back brace and a double mattress were ordered for him, and blood tests were ordered to check for any possible alternative forms of arthritis, other than osetoarthritis. Mr. Andrade concedes that he regularly receives medication for his back pain. On certain dates, he was told that there was a shortage of pain medication but that he could purchase Ibuprofen or Tylenol via the commissary.

35. The evidence overwhelmingly supports the Government's position that Mr. Andrade was given medical evaluations, is being treated appropriately, and is seeing doctors or health care professionals virtually on a daily basis. Although Mr. Andrade alleged that he had lost weight since he was first incarcerated, his RCC medical records did not support this assertion. His weight two days from his booking was 159 pounds, and his current weight is the same. He is not being denied reasonable and necessary medical care. To the contrary, he is receiving care, treatment and medication far beyond what he was receiving prior to his incarceration.

## Conclusion

Estelle v. Gamble and its progeny establish that inmates, including pretrial detainees, are entitled to adequate and appropriate medical care:

> These elementary principles establish the government's obligation to provide medical care for those whom it is punishing by incarceration. An inmate must rely on prison authorities to treat his medical needs; if the authorities fail to do so, those needs will not be met. In the worst cases, such a failure may actually produce physical "torture or a lingering death" . . . . In less serious cases, denial of medical care may result in pain and suffering which no one suggests would serve any penological purpose . . . . The infliction of such unnecessary suffering is inconsistent with contemporary standards of decency as manifested in modern legislation codifying the common-law view that "(i)t is but just that the public be required to care for the prisoner, who cannot by reason of the deprivation of his liberty, care for himself."

Estelle v. Gamble, 429 U.S. 97, 103-04 (1976).

The Court concludes that Mr. Andrade is receiving very good medical care at RCC. The care given him may not be the care that Mr. Andrade wants, but it is certainly adequate for his conditions.

He is receiving more medical attention now than he was prior to his incarceration, and the attention is appropriate and beneficial. No evidence was presented that Mr. Andrade's difficulties in concentrating and communicating with counsel are caused by any inadequacies in the medical care he is getting at RCC.

## Order

IT IS HEREBY ORDERED THAT Defendant Margarito Andrade Sr.'s Motion for Evidentiary Hearing on Defendant's Medical Care While in Custody [Doc. 327] is granted. The evidentiary hearing was conducted on August 18, 2010. After considering the evidence and testimony submitted at the hearing, the Court finds that Defendant failed to establish that the medical care he is receiving at RCC is inadequate or has contributed to any problems he may have in concentrating on his defense or communicating with his attorney.

*Lorenzo F. Garcia*
Lorenzo F. Garcia
United States Magistrate Judge